NUMBER 13-06-00398-CR



COURT OF APPEALS



THIRTEENTH DISTRICT OF TEXAS



CORPUS CHRISTI - EDINBURG 


 


JESUS TRANQUILINO CORTEZ, JR.

A/K/A JESUS CORTEZ, JR., Appellant,


v.



THE STATE OF TEXAS, Appellee.

 




On appeal from the 319th District Court of Nueces County, Texas.


 


MEMORANDUM OPINION



Before Chief Justice Valdez and Justices Yañez and Benavides


Memorandum Opinion by Chief Justice Valdez


 

 A jury convicted appellant, Jesus Tranquilino Cortez Jr., of three counts of
murder, see Tex. Penal Code Ann. § 19.02 (Vernon 2003), and one count of aggravated
assault with a deadly weapon, see id. § 22.02(a)(2) (Vernon Supp. 2007). Punishment was
assessed at ninety-nine years for each murder offense and twenty years for the aggravated
assault offense, with the sentences set to run concurrently. Appellant asserts seven issues
on appeal. We affirm. 

I. Background 

 On May 15, 2005, a Ford F-150 ("F-150") slammed head-on into an Isuzu Rodeo
("Rodeo"). The Rodeo carried four occupants, three of whom died instantly. The sole
survivor was Manuel Hernandez; the deceased were his wife and two daughters. Appellant
was the sole occupant of the F-150. On August 4, 2005, the State indicted appellant on
three counts of murder and one count of aggravated assault with a deadly weapon. Trial
commenced on June 13, 2006. 

A. The State's Case 

 The State's first witness was Manuel Hernandez. Hernandez testified that he, his
wife, and his two daughters were driving home after attending a graduation party. 
Hernandez occupied the front passenger seat; his wife and younger daughter were in the
backseat, and his elder daughter was driving. Hernandez stated that they were "relaxing
and just talking" when "out of the corner of his eye, [he] saw . . . two headlights right in front
of [them]." Hernandez stated that he was unsure if he "blacked out," but that he could
remember hearing the "hissing noise of the motor." Although in pain, Hernandez managed
to pull himself outside of the vehicle through the passenger side window. By this time,
other people had arrived and were attempting to assist him and his daughters. Emergency
personnel arrived shortly thereafter. 

 In testifying about his injuries, Hernandez stated that he suffered a cut over his
nose, several broken bones around his left eye, puncture holes on his left shin and elbow,
and a dislocated knee, which required knee-reconstructive surgery. Hernandez also stated
that at no point did he ever see or feel his daughter drive out of her driving lane, and that
the last thing he saw was the truck's headlights coming right at them. 

 The State also called Jesus Cortez, Sr., appellant's father, to the witness stand.
Cortez first testified that on the day in question, he called appellant at 6:39 p.m. and
inquired into his whereabouts. According to Cortez, appellant replied that he had taken
Cortez's's truck in order to get something to eat. Cortez added that approximately three
or four minutes later, he received a phone call from someone telling him that appellant had
been involved in an accident. Cortez also acknowledged that appellant had been involved
in a relationship with a girl named C.S. 

 On cross-examination, Cortez described the road where the accident took place as
a "two-way" road with "nothing marking the center line of the road." According to Cortez,
the road had been under construction for approximately a year and a half and was still
under construction at the time of the accident. Cortez also acknowledged that at no time
had he known appellant to try to harm himself in any way. Cortez finally stated that when
he talked to appellant at 6:39 p.m., he did not sound depressed or despondent. 

 The State also presented the testimony of Jacquelin Garcia, Kathleen Westfall, and
Ricardo Ramon. Garcia testified that on the day in question, at approximately 6:30 p.m.,
she was traveling north on FM 1889 towards Calallen, Texas, when she saw a red vehicle
being passed by a truck traveling south at a high rate of speed. According to Garcia, the
truck had more than sufficient time to pass the red car and move back into the proper lane. 
However, Garcia stated that the truck kept traveling directly towards her, that she began
honking, and that she was forced to swerve to her right onto some gravel. Garcia added
that the truck missed hitting her by approximately half a car length, that she was scared,
was shaking, and when she got home, she could barely stand because her legs were
shaking so much. Garcia further stated that based on her observations, it appeared that
the truck was traveling towards her in a purposeful manner. Finally, Garcia testified that
when she saw on the news that an accident had occurred on FM 1889, she recognized the
truck as the same truck that had almost hit her. 

 On cross-examination, Garcia testified that she could not recall whether the road
was under construction at that time, but she acknowledged that the road was only "two-lanes wide" and that there were no shoulder lanes on either side. 

 Kathleen Westfall testified to a similar account. According to Westfall, she and her
boyfriend, Ricardo Ramon, were traveling south on FM 1889 when she saw a grey F-150,
traveling north, right in front of them. According to Westfall, the F-150 was only a couple
of car lengths away when it forced them to pull off to the side of the road. Westfall added
that the F-150 neither slowed down or took any sort of evasive action as it approached
them. 

 Ricardo Ramon testified to the same incident. Ramon added, however, that he first
saw the F-150 when it attempted to pass another vehicle that was traveling in their
direction. Ramon stated that it seemed like the driver of the truck saw them because it
swerved back behind the vehicle it attempted to pass. According to Ramon, as he got to
within 30 or 40 feet of the oncoming vehicle, the F-150 again pulled into his lane causing
him to swerve to his right onto some gravel. Ramon stated that had he not swerved, the
truck would have hit them head-on, and that he felt the whole incident could have been
avoided if the truck had simply waited to pass the vehicle. Ramon further testified that he
later heard that a major accident had occurred on FM 1889 and that a truck fitting the
description of the F-150 that almost hit him was involved. He finally testified that he
recognized appellant as the person who was driving the F-150.

 The State also called State Troopers Manuel Castro Jr. and Cesar Villarreal Jr. 
Trooper Castro testified that he was notified of an accident involving a truck and a SUV at
approximately 7:00 p.m. He arrived at the scene minutes later. Testifying from a scaled
diagram of the collision that was admitted as evidence, Castro stated that he first observed
"shadow skid marks" that emanated from the Rodeo, which, according to Castro, meant
that an attempt to apply the brakes was made before impact. Castro added, however, that
no such skid marks were created by the F-150, and that the only skid mark left by the truck
was a "post-accident" "thick black tire mark." Castro also stated that the area where the
collision occurred was a "well-marked construction zone" with "nothing . . . in the road way
to make someone . . . take evasive action and get out the way." Castro placed the time
of the accident at 6:48 p.m., and noted that the truck's speedometer was locked at 76 miles
per hour. Castro concluded that the collision occurred because appellant was driving on
the wrong side of the roadway and again noted that there was no indication that appellant
ever applied the F-150's brakes before collision. 

 Trooper Villarreal, a "level 6" accident reconstructionist and forensic-mapping
specialist, testified as an expert witness for the State. Villarreal first noted that he created
the diagram of the collision that had been previously introduced into evidence. Testifying
from the diagram, Villarreal stated he first observed the "shadow skid marks" left by the
Isuzu Rodeo, which meant that there was, at the very least, "initial hard braking." Villarreal
also noted that there was no indication that the F-150 ever attempted to apply its brakes,
nor was there any evidence that appellant took any sort of evasive action to avoid the
collision. Villarreal added that if appellant had taken evasive action he would have
expected to see "yaw marks"on the road. (1) 

 Forensic Pathologist, Ray Fernandez, M.D., next testified on the State's behalf. 
According to Dr. Fernandez, the deceased persons suffered various severe injuries,
ranging from multiple abrasions; skeletal fractures, such as cervical spine, spinal column
and skull fractures; and internal bleeding. Dr. Fernandez concluded that the cause of
death for each victim was multiple blunt-force injuries. 

 The State's final witness was C.S. C.S. testified that she dated appellant for a
month and a half. She remembered that, while they were dating, appellant would
occasionally comment that he "wished he wasn't alive." C.S. stated that she broke up with
appellant approximately one week before the collision, that he became "sad" after the
break-up, and that each time appellant would call her, he would tell her that he wanted her
back. On the day of the collision, C.S. testified that she received two phone calls from
appellant, one at 6:27 p.m. and the second at 6:47 p.m. According to C.S., the first phone
call lasted approximately three minutes, and appellant had merely inquired what she had
done that day. She stated that he sounded normal. C.S. stated, however, that when she
received the second phone call, appellant sounded angry, that he said that "[this] was
going to [be] the last time [she] talked to him," and then simply hung up. C.S. stated that
she did not get a chance to talk to him or ask what he meant by that comment. C.S. also
acknowledged that appellant was involved in the collision shortly after the second phone
call. 

 On cross-examination, C.S. testified that she had never known appellant to try to
harm himself and that she didn't believe that appellant was going to harm himself even
after she received the second phone call. 

B. The Defense's Case 

 Appellant's first witness was Robstown High School principal, Roel Lara. Lara
testified that while appellant was attending high school, he never knew appellant to be
suicidal or mentally unstable. 

 John Orobio, appellant's cousin, next testified on appellant's behalf. According to
Orobio, three days after the collision took place, he drove to the impound lot where the F-150 was located and took various pictures of the vehicle. Two particular pictures taken by
Orobio showed appellant's right tennis shoe lodged between the vehicle's brake pedal and
the bottom portion of the dashboard. 

 On cross-examination, Orobio stated that he went to the impound lot with the intent
to take pictures of the vehicle. Orobio also acknowledged that it may have been possible
that the truck was tampered with between the time of the wreck and the time that he took
the pictures at the impound lot. 

 Appellant's next witness was Ezequiel Rodriguez, mental health coordinator for the
Nueces County Sheriff's Department. Rodriguez first described the procedures used by
prison officials to determine whether a prisoner is mentally unstable or suicidal. According
to Rodriguez, appellant never showed any signs that he was suicidal. On cross-examination, Rodriguez acknowledged that "no system is perfect," and stated that it is
possible for a prisoner to pass the initial mental health screen but later commit suicide.

 Adolfo Lopez, a friend of appellant's family, testified that moments before the
collision occurred, as he was driving north on FM 1889, he saw appellant driving the F-150. 
Lopez testified that he waved at appellant and that appellant waved back with a smile on
his face. 

C. The State's Rebuttal 

 After the defense rested, the State called Trooper Castro as a rebuttal witness. 
Trooper Castro testified that he thoroughly examined the inside and outside of the F-150
and did not see anything that looked like a red tennis shoe. Trooper Castro was also
shown photographs of the F-150 that were taken at the scene of the collision and
compared them to the photographs that were taken by Orobio three days later at the
impound lot. Trooper Castro noted that the inside of the truck was not the same, and that
usually after an investigation of a car accident is completed, the common practice is to pick
up any debris at the scene and place it in the vehicles. On cross-examination, Trooper
Castro stated that he had no evidence that the shoe was intentionally placed on the brake
pedal and also noted that a shoe lodged between a brake pedal and a dashboard is not
indicative of a person attempting to apply the brakes. 

II. Legal and Factual Sufficiency 

 By his first and second issues, appellant contends the evidence is legally and
factually insufficient to support his murder and aggravated assault convictions. 

A. Standards of Review

 In reviewing the legal sufficiency of the evidence to support a conviction, we view
all the evidence in the light most favorable to the prosecution in order to determine whether
any rational trier of fact could have found the essential elements of the crime beyond a
reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979); Clayton v. State, 235
S.W.3d 772, 778 (Tex. Crim. App. 2007). This standard gives full play to the responsibility
of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw
reasonable inferences from basic facts to ultimate facts. Jackson, 443 U.S. at 319;
Clayton, 235 S.W.3d at 778. 

 The trier of fact is the sole judge of the weight and credibility of the evidence. See
Tex. Code Crim. Proc. Ann. art. 38.04 (Vernon 1979); Margraves v. State, 34 S.W.3d 912,
919 (Tex. Crim. App. 2000). Thus, when performing a legal sufficiency review, we may not
re-evaluate the weight and credibility of the evidence and substitute our judgment for that
of the fact-finder. Dewberry v. State, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999). Instead,
we "determine whether the necessary inferences are reasonable based upon the combined
and cumulative force of all the evidence when viewed in the light most favorable to the
verdict." Hopper v. State, 214 S.W.3d 9, 16-17 (Tex. Crim. App. 2007). We must presume
that the fact-finder resolved any conflicting inferences in favor of the prosecution and defer
to that resolution. Jackson, 443 U.S. at 326; Clayton, 235 S.W.3d at 778. 

 When reviewing the factual sufficiency of the evidence to support a conviction, we
view all the evidence in a neutral light, favoring neither party. Watson v. State, 204 S.W.3d
404, 414 (Tex. Crim. App. 2006). We then ask whether the evidence supporting the
conviction, although legally sufficient, is nevertheless so weak that the fact-finder's
determination is clearly wrong and manifestly unjust or whether conflicting evidence so
greatly outweighs the evidence supporting the conviction that the fact-finder's
determination is manifestly unjust. Watson, 204 S.W.4d at 414-15; Johnson v. State, 23
S.W.3d 1, 11 (Tex. Crim. App. 2000). To reverse under the second ground, we must
determine, with some objective basis in the record, that the great weight and
preponderance of all the evidence, though legally sufficient, contradicts the verdict. 
Watson, 204 S.W.3d at 417. 

B. Legally and Factually Sufficient Evidence of Murder

 A person commits murder if he (1) intends to cause serious bodily injury and (2)
commits an act clearly dangerous to human life that (3) causes the death of an individual. 
Tex. Penal Code Ann § 19.02(b)(2). Intent to kill is not required to commit murder under
section 19.02(b)(2). Ramirez v. State, 229 S.W.3d 725, 729 (Tex. App.-San Antonio 2007,
no pet.). Rather, there must be an intent to cause serious bodily injury to the individual
whose death results from an act clearly dangerous to human life. Id.; see also Ortiz v.
State, 651 S.W.2d 764 (Tex. Crim. App. 1983). Here, the State's indictment alleged that
appellant, with the intent to cause serious bodily injury to himself, drove a motor vehicle on
the wrong side of the roadway, causing a collision that was clearly dangerous to human
life, that caused the deaths of Josefina, Maricella, and Melinda Hernandez. 

 Appellant's argument challenging the sufficiency of the evidence to support his
murder conviction is limited to whether he had the requisite intent to cause serious bodily
injury to himself and, in turn, intentionally caused the collision. 

 In his brief, appellant contends the following evidence negates any intent on his part
to harm himself: (1) C.S. testified that she did not believe appellant was going to harm
himself even after she received the second phone call from appellant; (2) Adolfo Lopez
testified that he saw appellant wave at him and smile moments before the collision
occurred; and (3) once appellant was pulled out of the truck, his first question was "what
did I hit?" 

 The following evidence, however, pointed towards appellant's intent to harm himself: 
(1) at approximately 6:10 p.m., Kathleen Westfall and Ricardo Ramon saw appellant pull
into their lane and force them off the road; (2) at approximately 6:30 p.m., Jacquelin Garcia
saw appellant's truck coming directly towards her and was also forced off the road; (3)
Westfall, Ramon, and Garcia each testified that they believed that appellant drove towards
them in a purposeful manner and that if they had not pulled off to the side of the road, they
would have been hit head-on by appellant; (4) C.S. testified that she dated appellant for
a month and a half and that, during their relationship she would on occasion hear appellant
say that "he wished he wasn't alive;" (5) C.S. broke up with appellant one week before the
accident; (6) at 6:47 p.m., C.S. received a phone call from appellant wherein he stated that
"it was going to [be] the last time [she] talked to him;" (7) appellant hit the Hernandez's
vehicle head-on at 6:48 p.m.; and (8) the investigation of the collision showed that at no
point did appellant apply the F-150's brakes, nor were there any signs that appellant took
evasive action to avoid the collision. 

 Intent is a question of fact and, therefore, within the sole purview of the jury, for
which the jury may rely on its collective common sense and apply common knowledge and
experience. Brown v. State, 122 S.W.3d 794, 800 (Tex. Crim. App. 2003); Ramirez v.
State, 229 S.W.3d 725, 729 (Tex. App.-San Antonio 2007, no pet.). Additionally, intent
may be inferred from the circumstantial evidence surrounding the incident including the
acts, words, and conduct of the accused. Patrick v. State, 906 S.W.2d 481, 487 (Tex.
Crim. App. 1995); Ramirez, 229 S.W.3d at 729. Assuming, without deciding, that the
evidence appellant points to lends support to his argument that he never intended to hurt
himself, that, as noted above, was not the only evidence that the jury heard. Due
deference must be accorded to the jury regarding the weight and credibility of the
evidence. See Jones v. State, 944 S.W.2d 642, 649 (Tex. Crim. App. 1996). Because
there was some evidence to support the jury's finding that appellant had the required
mental state, we conclude that the evidence was legally sufficient to support the conviction
under section 19.02(b)(2). Jackson, 443 U.S. at 319; Jones, 944 S.W.2d at 649; see also
Ramirez, 229 S.W.3d at 730. Further, viewing all the evidence in a neutral light, favoring
neither party, we hold that the evidence is factually sufficient to support appellant's murder
conviction. See Watson, 204 S.W.3d at 414. Appellant's first issue is overruled. 

C. Aggravated Assault 

 Appellant also contends the evidence is legally and factually insufficient to prove his
aggravated assault conviction. 

 A person commits an assault if the person "intentionally, knowingly, or recklessly
causes bodily injury to another." Tex. Penal Code Ann. § 22.01(a)(1) (Vernon Supp. 2007). 
To prove aggravated assault, the State must prove that the actor committed an assault as
defined in section 22.01 and the person (1) caused serious bodily injury to another,
including the person's spouse; or (2) used or exhibited a deadly weapon during the
commission of the assault. Id. § 22.02(a) (Vernon Supp. 2007). Here, the State alleged
that appellant used a deadly weapon during the commission of his assault. As such, the
State was required only to prove that Hernandez sustained "bodily injury" as opposed to
"serious bodily injury." See id. § 22.02(a)(2). 

 "Bodily injury" means "physical pain, illness, or any impairment of physical
condition." Id. § 1.07(a)(8) (Vernon Supp. 2007). "This definition appears to be
purposefully broad and seems to encompass even relatively minor physical contacts so
long as they constitute more than mere offensive touching." Lane v. State, 763 S.W.2d
785, 786 (Tex. Crim. App. 1989). 

 Appellant contends that the evidence is insufficient to prove that Manuel Hernandez
sustained bodily injury because, at trial, the State introduced into evidence medical records
that belonged to someone other than Manuel Hernandez. Nonetheless, the State also
elicited testimony from Manuel Hernandez. Hernandez testified that he suffered a cut over
his nose, several broken bones around his left eye, puncture holes on his left shin and
elbow, a dislocated knee, and permanent disfiguring scars. Hernandez further testified that
he was in the hospital for eight days and walks with a limp because of his knee injury. We
find that Hernandez supplied sufficient testimony to prove that he sustained bodily injury
as a result of the collision. See Allen v. State, 533 S.W.2d 352, 354 (Tex. Crim. App.
1976) (recognizing that testimony from the victim that she suffered physical pain is
generally sufficient to prove bodily injury); Letson v. State, 805 S.W.2d 801, 806-07 (Tex.
App.-Houston [14th. Dist.] 1990, no pet.) (same). We conclude that the evidence is legally
and factually sufficient to support appellant's aggravated assault conviction. See Jackson,
443 U.S. at 319; Watson, 204 S.W.3d at 414. Appellant's second issue is overruled. 

III. Lesser-Included Offense 

 By his third issue, appellant contends that the trial court erred in refusing to charge
the jury on the lesser-included offense of assault. 

 A defendant is entitled to an instruction on a lesser-included offense if (1) the lesser
offense is a lesser-included offense of the charged offense, and (2) there is some evidence
in the record that would permit a jury rationally to find that if the defendant is guilty, he is
guilty only of the lesser offense. Guzman v. State, 188 S.W.3d 185, 188 (Tex. Crim. App.
2006). 

 Under prong one, we compare the elements of the charged offense, as modified by
the indictment, with elements of the lesser offense that might be added to the jury charge. 
Id. "We compare the elements of both offenses to determine whether, in proving the
offense as charged, the State necessarily had to prove all the elements of the lesser
offense, plus something more." Id. at 189 & n.7 (applying article 37.09 of the Texas Code
of Criminal Procedure). If prong one is met, we then consider, under prong two, whether
there is some evidence from which a jury rationally could find that, if the defendant is guilty,
he is guilty only of the lesser offense. Id. At this step of the analysis, "the evidence must
establish the lesser-included offense as a valid, rational alternative to the charged offense." 
Hall v. State, 225 S.W.3d 524, 536 (Tex. Crim. App. 2007). 

 Here, the parties agree that under the circumstances of this case, assault was a
lesser-included offense of aggravated assault. The key distinction between the two
offenses, as raised by appellant, is that the aggravated assault charge required the State
to show that appellant used a deadly weapon during the commission of the assault,
whereas the simple assault charge did not. See Tex. Penal Code Ann. §§ 22.01(a)(2),
22.02(a)(2), 22.02(b)(2). Accordingly, in order for appellant to have been entitled to the
simple assault charge, there must have been some evidence presented that would have
permitted a rational jury to find that appellant did not use a deadly weapon in committing
the assault. More specifically, there must be some evidence upon which the jury could
have determined that appellant did not use his vehicle in a manner capable of causing
death or serious bodily injury. See Garcia v. State 92, S.W.3d 574, 576 (Tex. App.-Austin
2002, no pet.) ("To be entitled to an instruction on simple assault, it was necessary that
there be some evidence that would rationally warrant the jury in finding that the appellant
did not use his truck as a deadly weapon. It is not enough that the jury might simply
disbelieve crucial evidence; there must be some evidence that the truck was not a deadly
weapon in the manner of its use."). 

 In his brief, appellant argues that "the jury could have found him guilty of assault
causing bodily injury if the jury did not believe that the vehicle was intentionally used a
deadly weapon to harm himself." First, we note that an intent to achieve a specific purpose
is not necessary to support a finding that an object was a deadly weapon in the manner
of its use. See id. at 575-576. Instead, we look to the manner in which an object is
actually used. Id. We have already determined that sufficient evidence exists to support
a finding that appellant intentionally drove the F-150 into the Hernandez vehicle. As such,
we further conclude that there is no evidence that would rationally support a finding that
appellant assaulted Hernandez but did not use a deadly weapon in doing so. Appellant's
third issue is overruled. IV. Admission of Photographs 

 By his fourth issue, appellant complains the trial court abused its discretion in
admitting nine autopsy/crime scene photographs of the deceased, exhibits 15, 16, 17, in
violation of Texas Rules of Evidence 401 and 403. Specifically, appellant argues that the
photographs "were not material to any issue in the case" and were "highly inflammatory." 

 The admissibility of a photograph is within the sound discretion of the trial judge. 
Shuffield v. State, 189 S.W.3d 782, 786 (Tex. Crim. App. 2006). A photograph is relevant
if it has "any tendency to make the existence of any fact that is of consequence to the
determination of the action more probable or less probable than it would be without the
evidence." Tex. R. Evid. 401. Here, the photographs depicted the victim's bodies at the
scene of the collision and as they were received at the morgue. The State offered the
photographs during the testimony of medical examiner Dr. Ray Fernandez, and as the
photographs were shown to Dr. Fernandez, the State inquired whether the victim depicted
was the person he performed the autopsy on. The photographs were therefore utilized to
identify the state of the victims' bodies prior to the autopsy. We find that the photographs
were relevant during the guilt phase of trial. See Shuffield, 189 S.W.3d at 787
(photographs showing location of body, crime scene, and wounds that caused victim's
death were relevant, even though issue of cause of death was presented by other evidence
and was not in dispute). 

 Even relevant evidence, however, may be excluded if its probative value is
substantially outweighed by its prejudicial effect. Tex. R. Evid. 403. Rule 403 favors the
admission of relevant evidence and carries a presumption that relevant evidence will be
more probative than prejudicial. Id. at 787. A rule 403 analysis should include, but is not
limited to, (1) how probative the evidence is; (2) the potential of the evidence to impress
the jury in some irrational, but nevertheless indelible way; (3) the time the proponent needs
to develop the evidence; and (4) the proponent's need for the evidence. Id. In the context
of the trial court's admitting photographs, we consider the number and size of the
photographs, whether they are in color or black and white, whether they are gruesome,
whether the body is naked or clothed, and whether the body has been altered by autopsy. 
Id.; Frank v. State, 183 S.W.3d 63, 77 (Tex. App.-Fort Worth 2005, pet. ref'd). 

 Exhibits 15, 16, and 17 contain a set of three photographs per exhibit. Each set
contains a photograph of a victim at the scene of the accident, and two photographs of the
same victims' body as it was received by the Nueces County Medical Examiner. Each set
depicts a different victim. The photographs show the victims from their waist up, with their
bodies situated on top of "body bags." Only minor injuries are apparent, and as the photos
were taken before the autopsy, no alterations are shown. The photographs are probative
in that they were utilized for identification purposes, and, without question, aided the jury's
understanding of the reality and general nature of the crime. 

 Turning to the other relevant factors, all nine photographs at issue are roughly three
by three and a half inches or smaller, were presumably in color, and were not especially
gruesome. None depict any mutilation caused by an autopsy and each photograph depicts
the victim fully clothed. Lastly, we note that the State utilized little time to develop the
evidence. After considering the appropriate factors, we conclude the trial court did not
abuse its discretion in finding the relevance of the photographs was not substantially
outweighed by the danger of unfair prejudice. See Sierra v. State, 157 S.W.3d 52, 62
(Tex. App.-Fort Worth 2004), aff'd, 218 S.W.3d 85 (Tex. Crim. App. 2007). Appellant's
fourth issue is overruled. 

V. Jury Instruction 

 By his fifth issue, appellant argues that the trial court's instruction to the jury, that
appellant's sentences would run concurrently, constitutes reversible error. The trial court,
however, does not err in giving such an instruction. McGowan v. State, 664 S.W.2d 355,
358-59 (Tex. Crim. App. 1984); Haliburton v. State, 578 S.W.2d 726 (Tex. Crim. App.
[Panel Op.] 1979); Strong v. State, 138 S.W.3d 546, 557 (Tex. App.-Corpus Christi 2004,
no pet.). Appellant urges us to depart from Haliburton; we again decline to do so. See
Strong 138 S.W.3d at 557. Appellant's fifth issue is overruled 

VI. Ineffective Assistance of Counsel 

 By his sixth and seventh issues, appellant argues that his trial counsel was
ineffective because he failed to call "invaluable" witnesses to mitigate punishment, and
because he rejected a plea bargain proposed by the State without adequately explaining
the offer and its consequences to appellant.

A. Standard of Review 

 To prevail on a claim of ineffective assistance of counsel, appellant must prove by
a preponderance of the evidence that: (1) counsel's performance fell below the standard
of prevailing professional norms; and (2) there is a reasonable probability that, but for
counsel's deficiency, the result of the trial could have been different. See Strickland v.
Washington, 466 U.S. 668, 687 (1984); Thompson v. State, 9 S.W.3d 808, 812 (Tex. Crim.
App. 1999). A reasonable probability is one sufficient to undermine confidence in the
outcome of the proceedings. Thompson, 9 S.W.3d at 812. Allegations of ineffective
assistance of counsel must be firmly founded in the record, and the record must
affirmatively demonstrate the alleged ineffectiveness. Id. at 813. 

 Moreover, an appellate court's review of the defense counsel's representation is
highly deferential, and we presume that counsel's action fell within the wide range of
reasonable and professional assistance. Ex parte Chandler, 182 S.W.3d 350, 354 (Tex.
Crim. App. 2005); Bone v. State, 77 S.W.3d 828, 833 (Tex. Crim. App. 2002). 

B. Mitigation

 By his sixth issue, appellant argues that trial counsel failed to present mitigating
evidence at the punishment stage of trial. Appellant points to various affidavits attached
to his motion for new trial, wherein three Robstown police officers, a teacher, and a school
administrator indicated their willingness to testify to appellant's character. Each affidavit
contains a general statement that appellant was a good, respectful, young man; who only
began to change after his parents divorce, when he started to hang out with the wrong
crowd and got involved with drugs. 

 A claim for ineffective assistance of counsel may not be predicated upon a failure
to call witnesses unless appellant shows that such witnesses were available and that their
testimony would have benefited the appellant. See King v. State, 649 S.W.2d 42, 44 (Tex.
Crim. App. 1983). Additionally, proffered evidence must be more than cumulative of other
evidence at trial to raise a specter of ineffective assistance. Holland v. State, 761 S.W.2d
307, 319 (Tex. Crim. App. 1988); Ketchum v. State, 199 S.W.3d 581, 597 (Tex.
App.-Corpus Christi 2006, pet. ref'd). 

 At the punishment hearing, appellant called his mother, Ida Cortez, and aunt, Maria
Orobio, to testify on his behalf. Each witness testified to appellant's character, noting that
appellant had changed since his parents' divorce, that they saw a change in the friends he
chose to hang out with, and that he was a different person when he used drugs. Ida
Cortez detailed the problems appellant had with drugs and school, and she stated that she
raised him in a "good, respectful, manner." Under Holland, proffered testimony must be
more than cumulative of other testimony at trial. Holland, 761 S.W.2d at 319. Here, the
proffered testimony provided in each affidavit was clearly cumulative of comparable
testimony provided by appellant's aunt and mother. Appellant's sixth issue is overruled. 

C. Plea Bargain

 By his seventh issue, appellant argues that his trial counsel failed to advise him
adequately on accepting the State's plea bargain offer. Appellant argues that "counsel's
failure to fully explain the offer effectively denied appellant the opportunity to make an
informed decision about whether to accept or reject the offer." 

 Generally, the record on direct appeal is not sufficient to show trial counsel's tactical
or strategic reasons for his trial decisions; thus it is usually insufficient to overcome the
presumption of reasonable and professional conduct. See Bone, 77 S.W.3d at 833. It is
incumbent on appellant to present a record on appeal that shows a lack of plausible trial
strategy. See Jackson v. State, 877 S.W.2d 768, 771 (Tex. Crim. App. 1994). In the face
of a record silent as to counsel's trial strategy, an appellate court should not speculate
about counsel's tactics or reasons for taking or not taking certain actions. See Bone, 77
S.W.3d at 833-35. 

 First, we note that appellant failed to allege that his trial attorney was ineffective with
regard to the plea offer in his motion for new trial. Second, the record does not reflect trial
counsel's reasoning behind his tactical or strategic decisions, and we may not speculate
that no plausible professional reasons exist. See id. at 836. Because defense counsel has
not been given an opportunity to explain his actions, he may not, on this record, be
condemned as unprofessional and incompetent. See id. 

 We conclude appellant has failed to present a sufficient record to rebut the
presumption of reasonable and professional conduct by trial counsel. See Scheanette v.
State, 144 S.W.3d 503, 510 (Tex. Crim. App. 2004) (rejecting ineffective assistance claim
for insufficient record). We overrule appellant's seventh and final issue. 

VII. Conclusion

 We affirm the trial court's judgment.

 

 ROGELIO VALDEZ

 Chief Justice

 

Do not publish. Tex. R. App. P. 47.2(b).

Memorandum Opinion delivered and filed 

this the 27th day of August, 2008.

1. Trooper Villarreal described a "yaw mark" as


 "a tire mark left by a rolling tire. If you're driving down the roadway and you turn the vehicle
pretty sharp, your tire is going to continue to roll. However, you're going to see a wider skid
mark that starts thin, goes wide, then goes back thin again. This skid mark is characterized
by striations. That's basically-striations are caused by the grooves of the tire. You expect
to see that, a loop going . . . back into his lane of travel, the F-150's."